# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| GRALING ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00092 JAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the Commissioner of Social Security's final decision denying Graling Robinson's ("Robinson") application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* and supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

## I.    Background

On August 27, 2012, Robinson protectively filed applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.* and for SSI benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* (Tr. 137-149) In both applications, Robinson alleged disability beginning March 9, 2008. The Social Security Administration ("SSA") denied Robinson's claims on October 22, 2012. (Tr. 80-81, 84-88) He filed a timely request for a hearing before an administrative law judge ("ALJ") on November 30, 2012. (Tr. 89-90) Following a video hearing held on December 16, 2013, the ALJ issued a written decision on January 28, 2014, upholding the denial of benefits. (Tr. 13-21) Robinson requested review of the ALJ's decision by the Appeals Council (Tr. 5-9) On March 23, 2015, the Appeals Council

denied his request for review. (Tr. 1-4) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 106-7 (2000).

Robinson filed this appeal on May 22, 2015. (Doc. No. 1) The Commissioner filed an answer on August 3, 2015. (Doc. No. 9) Robinson filed a Brief in Support of his Complaint. (Doc. No. 11) The Commissioner filed a Brief in Support of the Answer. (Doc. No. 12)

## II.    Administrative Decisions

### A.  Decision of the ALJ

The ALJ determined that Robinson meets the insured status requirements of the Social Security Act through September 30, 2017, and had engaged in substantial gainful activity between March 9, 2008, the alleged onset date, and October 14, 2011. (Tr. 15) The ALJ's remaining findings addressed the period from October 15, 2011 through the decision date, when Robinson did not engage in substantial gainful activity. (Tr. 16)

The ALJ found that Robinson has the severe impairments of status post left leg amputation, mild chondromalacia[1] and mild degenerative changes of the right knee, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

After considering the entire record, the ALJ determined that Robinson has the residual functional capacity ("RFC") to perform sedentary work in that he can lift and carry 10 pounds occasionally and frequently, stand and walk for two hours in an eight-hour day, and sit for six hours in an eight-hour day. (Id.) However, the ALJ found that Robinson must be able to alternate positions every 45 minutes for brief position changes while continuing to work. He retains the ability to occasionally climb ramps and stairs, but may never climb ladders, ropes or scaffolds.

---

[1] Chondromalacia, also known as "runner's knee," is a condition where the cartilage on the undersurface of the patella (kneecap) deteriorates and softens. www.healthline.com/health/chondromalacia-patella (last visited Sept. 15, 2016).

(Id.) The ALJ found Robinson unable to perform any past relevant work, but that jobs exist in significant numbers in the national economy that he can perform, such as document preparer, cutter/paster, and pharmacy processor. (Tr. 20-21) Thus, the ALJ found that a finding of "not disabled" was appropriate. (Tr. 21)

### III.     Administrative Record

The following is a summary of the relevant evidence before the ALJ.

### A.     Hearing Testimony

The ALJ held a video hearing in this matter on December 16, 2013, and heard testimony from Robinson and Alissa Smith, a vocational expert.

### 1.     Robinson's testimony

Robinson was twenty-seven at the time of the hearing and living with his wife. (Tr. 32-33) He is 5 feet 9 inches tall and weighs approximately 190 pounds. (Tr. 52) He completed high school. (Tr. 32-33) In March of 2008 Robinson was injured in a motorcycle accident. His left leg was amputated above the knee and he was fitted with a left leg prosthesis. His right ankle was also injured and he wears an ankle brace every day for support. (Tr. 38-39) It was Robinson's testimony that the pain from his prosthesis prevents him from working a full-time job. (Tr. 44, 53)

Robinson has no difficulties driving and needs no special accommodation for his car. (Tr. 33) He is able to do housework including cooking and laundry, and usually sits on a stool by the sink to do the dishes. (Tr. 34, 49) In terms of his personal care, Robinson has to sit in a shower chair because he can't wear his prosthesis in the shower. (Id.) He sleeps between six and eight hours a night with occasional difficulty when the nerves in the residual limb start acting up. (Tr. 35-36)

In a typical day Robinson watches television, reads, helps pick up a little around the house. (Tr. 36, 50-51)) He is able shop for groceries once or twice a month. (Tr. 49) He goes to church occasionally (Tr. 49-50) Robinson goes fishing three or four times a year and deer hunting 5 or 6 times during the season. (Tr. 50) He uses a computer at home. (Id.)

Robinson last worked in September 2013 stocking groceries for a period of two and a half weeks for 18 hours a week. He was able to wear his prosthesis most of the time. He had three absences during that time because his leg was swollen and he couldn't wear his prosthesis, and one day he went home early because his right knee was swelling. He has trouble lifting because he is not able to squat down to pick up things. (Tr. 36-37) It was Robinson's testimony that his knees swell about twice a week. (Tr. 38) He was laid off from his job in the machining department of Briggs and Stratton in October 2011 because of attendance issues with his left leg and his prosthesis. (Tr. 46) He averaged five absences a month – all related to his leg issues. (Tr. 53-54)

Robinson is able to climb stairs with his prosthesis and with his crutches. (Tr. 34) He cannot walk foot over foot to climb stairs; he climbs them one at a time using his right leg because he lacks the muscle strength to push up with his left leg. (Id.) His body weight is supported on his right leg. (Id.) Robinson testified that he can stand comfortably with his prosthesis for 25-30 minutes. (Tr. 39-40) If he uses his crutches, he can stand for about 45 minutes. (Tr. 40) He starts to develop pain in his right ankle and knee and into his back and shoulders. (Id.) He also experiences pain in his left leg where the socket for the prosthesis sets. (Id.) In terms of sitting, he experiences pain in his lower back, shoulder, and right hip, especially if he is wearing his prosthesis because the socket goes all the way up his hip. (Tr. 41) He can walk a few hundred feet without stopping when wearing his prosthesis; with his crutches he can

walk 300 to 400 feet before stopping to rest. (Tr. 49) At that point, he has pain in his right knee and ankle as well as his shoulders from the crutches themselves. (<u>Id</u>.) Robinson complained that he couldn't afford medical treatment for this pain. (Tr. 41-42, 45) He has some difficulty with balance when he reaches out in front of himself or overhead. (Tr. 42) If he had to lift something for two and a half hours a day, five days a week, he could lift between 25 and 30 pounds if it was at table height so he wouldn't have to stoop or bend down to get it. (<u>Id</u>.) He takes a generic form of Flexeril, cyclobenzaprine and tramadol for pain. (Tr. 43) Robinson smokes a pack of cigarettes a day. (Tr. 52, 266, 269)

### 2.    Testimony of Vocational Expert

Vocational expert Alissa Smith characterized Robinson's past work as a forklift operator for Briggs and Stratton as semi-skilled, medium, with a specific vocational preparation (SVP) of 3, but very heavy as actually performed. (Tr. 57) With regard to his past work as a silkscreen frame assembler for Evsco Industries, Smith characterized it as semi-skilled, with an SVP of 3. Pursuant to the DOT, the work is light, but very heavy as performed by Robinson. (<u>Id</u>.)

For the first hypothetical, the ALJ asked Smith to assume a hypothetical individual with this vocational history who is limited to light work; standing four hours of an eight-hour work day; sitting six hours of an eight-hour work day; and who can only occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds. (Tr. 57-58) Smith opined that such an individual could not perform any of these past jobs as actually performed or generally performed in the national economy but would be able to work as an office helper, DOT number 239.567-010, with approximately 800 such jobs locally and 41,000 nationally. (Tr. 58) This is light work with an SVP of 2. Smith further opined that such an individual would also be able to work as a routing clerk, DOT number 222.587-038, with 930 jobs locally and 75,900 nationally. (Id.)

Lastly, Smith opined that such an individual could work as a price marker, DOT number 209.587-034, with 4,200 jobs locally and 267,600 nationally. (Id.)

The ALJ then asked Smith to assume those same restrictions and consider sedentary jobs. Smith identified three examples of sedentary work with an SVP of 2. The first job was document preparer, DOT number 249.587-018, with 1,040 jobs locally and 45,330 nationally. (Tr. 58-59) The second job was cutter/paster, DOT number 249.587-014, with 600 such jobs locally and 24,400 nationwide. (Tr. 59) The third job was pharmaceutical processor, DOT number 559.687-034, with 620 jobs locally and 27, 350 nationally. (Id.)

For the third hypothetical, the ALJ asked Smith to assume the individual needed to alternate positions every 45 minutes for a brief position change. Smith opined that the individual would still be able to perform the sedentary jobs, but that the light jobs would be eliminated. (Id.)

Upon questioning by Robinson's attorney, Smith testified that if an individual was absent twice a month due to their medical symptoms, then both light and sedentary work would be precluded. (Tr. 61)

### B.   Medical Records

The ALJ summarized Robinson's medical records at Tr. 17-19. Relevant medical records are discussed as part of the analysis.

### IV.   Standards

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, No. 4:10CV2184 HEA, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2,

2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F. Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495

F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

**V.  Discussion**

In his appeal of the Commissioner's decision, Robinson raises two issues. First, he alleges the ALJ erred in his RFC determination by discounting the opinion of the consultative examiner, Chul Kim, M.D., regarding his specific work-related functional limitations. (Doc. No. 11 at 8-13) Second, Robinson challenges the ALJ's credibility determination. (Id. at 14-15)

**Credibility**

The Court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Robinson's credibility was essential to her determination of other issues. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) ("The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC."); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002) (same).

In evaluating a claimant's credibility, the ALJ should consider the claimant's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The claimant's relevant work history and the absence of objective medical evidence to support the complaints may also be considered, and the ALJ may discount subjective complaints if there are inconsistencies in the record as a whole. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (citing Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Id. (citing Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995)). The Court will uphold an ALJ's credibility findings, so long as they are adequately explained and supported. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).

Here, the ALJ found Robinson's statements concerning the intensity, persistence and limiting effects of his symptoms not entirely credible. (Tr. 17) The ALJ noted the lack of medical documentation to support Robinson's complaints of ongoing neuropathic pain, swelling, or other stump complications, minimal medical treatment for his alleged impairments, work history

reflecting that he was able to work in spite of his impairments, and activities of daily living, all of which were inconsistent with his allegations of disabling pain and limited mobility. (Tr. 17-19)

With regard to Robinson's daily activities, the ALJ found they were inconsistent with his allegations of pain. (Tr. 19) Robinson reported no difficulty bathing, grooming and dressing. He could prepare full meals at a normal pace without assistance. He was able to perform a full range of housework, including laundry and washing dishes. He also reported using a riding lawn mower, again without assistance. Robinson shops for food and household necessities once a month for four to five hours. He spends time with friends, watching television, playing games and barbequing. (Tr., 34-35, 49, 50, 215-227) At the hearing, Robinson also reported engaging in hobbies such as hunting and fishing. (Tr. 50) An ALJ may view "[a]cts which are inconsistent with a claimant's assertion of disability" to "reflect negatively upon that claimant's credibility." Chaney v. Colvin, 812 F.3d 672, 677 (8th Cir. 2016) (quoting Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)). See also Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding activities such as driving his children to work, driving his wife to school, shopping, visiting his mother, taking a break with his wife between classes, watching television, and playing cards were inconsistent with claimant's complaints of disabling pain).

Robinson's daily activity was just one of several factors the ALJ considered in assessing his credibility. The ALJ also considered the absence of objective medical evidence to support his complaints. For instance, there is no record of any infections or other complications of ongoing prosthetic use. (Tr. 17-18) Examinations while Robinson was still working reflected minimal findings other than tenderness to palpation in the right knee and just slightly above the left amputation site. He had full range of motion, normal neurological functioning and no gross

swelling. (Tr. 263-65, 270) An examination performed on September 15, 2011 revealed Robinson to be neurologically intact with normal sensation, reflexes, coordination, muscle strength and muscle tone. No swelling, lesions or rashes were observed on the skin. (Tr. 259-61) The absence of an objective medical basis to support the degree of subjective complaints is an important factor in evaluating the credibility of the claimant's testimony and complaints. Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991). See also Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (lack of objective medical evidence is a factor an ALJ may consider). The ALJ did acknowledge, however, the objective evidence supporting Robinson's allegations of pain in the right knee. (Tr. 18) Specifically, an MRI performed on May 11, 2011, showed a mild sprain of the anterior cruciate ligament with mild chondromalacia and mild degenerative changes in the lateral patellar facet and the posterior horn of the medial meniscus. (Tr. 271)

The ALJ also noted Robinson had had minimal medical treatment for his alleged impairments and was not prescribed any medications for orthopedic related complaints. (Tr. 18, 260-61) In October 2012, Robinson reported to Dr. Kim that he no longer took medication. (Tr. 280) He briefly received physical therapy for his right knee pain, but this treatment predated his separation from work. (Tr. 18, 259-278) An ALJ may properly consider that a claimant has not made significant efforts to seek medical treatment to alleviate his alleged pain, and that a claimant was not taking any prescription medicine intended to treat such pain. See Davis v. Apfel, 239 F.3d 962, 966-67 (8th Cir. 2001) citing Shannon v. Chater, 54 F.3d 484, 487(8th Cir.1995); see also Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) ("The absence of prescription medicine and the failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain").

The ALJ noted that Robinson resumed medical care on October 21, 2013, shortly before his administrative hearing. (Tr. 18) He complained of pain in his right knee and ankle, but denied phantom pain in his left lower extremity. Significantly, Robinson himself reported using his prosthesis daily and did not report limitations. (Tr. 18, 221, 256, 286) Robinson's physical examination was unremarkable other than generalized swelling of the knee with pain on range of motion testing. There was no joint instability and his gait and stance were normal. (Tr. 285-88)

Robinson argues the ALJ failed to properly consider his reason for lack of treatment, namely, that he did not have medical insurance and could not afford treatment. (Doc. No. 11 at 15) The Commissioner responds that by resuming treatment shortly before his hearing, Robinson demonstrated he could obtain medical care when he thought it was necessary. (Doc. No. 12 at 7) Moreover, there was no evidence that Robinson sought low cost or free treatment and been denied care or that he stopped purchasing cigarettes in order to have funds to obtain medical care. See Goff, 421 F.3d at 793 ("However, there is no evidence Goff was ever denied medical treatment due to financial reasons."); see also Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (Plaintiff's claim, that he could not afford medication, is inconsistent with the fact that he did not seek any treatment offered to indigents, nor did he choose to forgo smoking three packages of cigarettes each day to help finance pain medication.); Clark v. Shalala, 28 F.3d 828, 831 fn. 4 (8th Cir. 1994) (Where plaintiff offers no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints, the ALJ was warranted in discrediting plaintiff's complaints for failing to seek medical treatment after her alleged onset date).

In making her credibility assessment, the ALJ also considered Robinson's fair work history with steady, average earnings. (Tr. 18, 173-76) In particular, Robinson was able to return

to substantial gainful activity without any significant break in work after his 2008 accident and, in 2009 and 2010, earned more than he did in the years preceding his amputation. (Tr. 18-19) He was laid off three years after his amputation, indicating that his disability was unrelated to his separation from work. (Tr. 19) The ALJ properly relied on this fact in discrediting Robinson's allegations. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." Galvan v. Astrue, 2011 WL 4501067, at *7-8 (E.D. Mo. Sept. 28, 2011) (quoting Goff, 421 F.3d at 793). See also Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001) (noting that ALJ's finding that plaintiff was not fully credible was supported by the fact that plaintiff did not lose his job because of his disability, but because his position was eliminated).

Robinson argues the ALJ mischaracterized his work following his 2008 accident and specifically failed to properly consider the evidence of decline in his functioning since 2011 that led to his pursuit of disability benefits. (Doc. No. 11 at 15) He points to three absences from work in 2013 that lasted just under three weeks due to his residual limb swelling (Tr. 37), and cites to an Employer Questionnaire as support (Tr. 256). According to his supervisor Warren Bland, however, Robinson actually had "very little" absence/tardy issues. (Tr. 256)

The ability to maintain employment with an impairment, together with the absence of evidence that the condition has significantly deteriorated, tends to prove the impairment was not disabling. See Goff, 421 F.3d at 792 (the fact that claimant worked with impairments for over three years after her strokes without significant deterioration demonstrated her impairments were not disabling in the present.). See also Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

In sum, the Court finds the ALJ considered Robinson's subjective complaints on the basis of the entire record and set out a number of inconsistencies that detracted from his credibility.

Because the ALJ's determination not to credit Robinson's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. Cobb v. Colvin, 2014 WL 6845850, at *14 (E.D. Mo. Dec. 3, 2014) (internal citations omitted). See also Polaski, 739 F.2d at 1322.

**Medical opinion evidence**

Because there were no opinions from any treating or reviewing sources, a consultative examination was ordered. (Tr. 18-19) Chul Kim, M.D., performed an examination of Robinson's lower extremities on October 9, 2012. The examination demonstrated that Robinson was able to bear full weight on his right leg and walk well with a pair of crutches. He could not, however, squat on his right leg more than halfway. His right knee had flexion to 125 degrees. While wearing a brace on his right ankle, Robinson was able to dorsi-flex the right ankle to 10 degrees and plantar-flex to 40 degrees without pain. The right pedal pulses were present and there was no edema in his right leg. The neurological examination was non-specific including sensory, motor, reflex and muscle mass in the right lower extremity. The left leg amputation surface had moderately decreased sensory for pain and cold. (Tr. 280-83)

In her decision, the ALJ specifically noted Dr. Kim's findings and identified several reasons for giving no weight to Dr. Kim's opinion that Robinson could not wear his prosthesis for more than two days in a row because of swelling and pain no weight. First, Dr. Kim's examination revealed no clinical signs or findings of swelling, redness, inflammation or other indicia of stump complications. While the noted sensory loss would be expected given the nature of Robinson's injury, the ALJ found it did not indicate stump complications that would preclude use of the prosthesis for ambulation. (Tr. 19) Next, the ALJ found Dr. Kim's statement that Robinson can only use his prosthesis for two days at a time contrary to his extensive activities of

daily living. (Id.) Lastly, the ALJ found Dr. Kim's statement "wholly contrary" to Robinson's extensive and successful work activity status post amputation. (Tr. 19-20)

Robinson argues that absent Dr. Kim's opinion, there was no evidence of record addressing his work-related functional limitations and thus no medical support for the RFC finding. He further argues that the ALJ should exercise her duty to develop the record and obtain additional medical evidence to consider for her RFC determination. (Doc. No. 11 at 9-10)

A claimant's RFC is a medical question (as opposed to a vocational question) and must be supported by some medical evidence; however, an ALJ is not limited to considering medical evidence exclusively. An ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ is required to order medical examinations and tests only if the medical records do not provide sufficient medical evidence to determine whether the claimant is disabled. Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. § 1519a(a). As discussed herein, the ALJ thoroughly reviewed the medical evidence of record and made factual findings regarding this evidence. There is no indication the ALJ felt unable to make the assessment she did. Tellez, 403 F.3d at 957.

Indeed, the medical record evidence from Quad/Med Sussex showed no complications of ongoing prosthetic use. As discussed above, there was some evidence supporting Robinson's allegations of pain in the right knee (Tr. 271), but overall, the record indicated minimal medical treatment for his alleged impairments. On repeated examinations while Robinson was still working in 2011, he had full range of motion, normal neurological functioning and no gross swelling. (Tr. 18, 263, 265, 270) He was neurologically intact with normal coordination, muscle

strength and tone, and no swelling, lesions, or rashes on his skin. (Tr. 18, 160-61) On October 21, 2013, Robinson presented for examination at Naylor Medical Clinic and reported using his prosthesis without limitation. His physical examination was unremarkable except for generalized swelling of the knee with pain on range of motion testing. (Tr. 286-87)

Upon review of the record, the Court concludes that the ALJ properly evaluated Dr. Kim's opinions, listing "good reasons" for giving them no weight. Prosch, 201 F.3d at 1013. More importantly, the ALJ provided a detailed narrative discussion of how the medical facts and non-medical evidence supported her finding. The Court finds, therefore, that the ALJ's decision to discount Dr. Kim's opinion is supported by substantial evidence on the record as a whole.

**VI.     Conclusion**

For these reasons, the Court finds there is substantial evidence in the record as a whole to support the denial of benefits and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate Judgment will accompany this Order.

Dated this 26th day of September, 2016.

_John A. Ross_
_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**